**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**DAVID B. COOK, II,**

      **Plaintiff,**

**vs.**                                             **CIVIL ACTION NO. 2:17-CV-03374**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered June 26, 2017 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 12 and 13.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (Document No. 12.), **GRANT** Defendant's request to affirm the decision of the Commissioner (Document No. 13.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter the Court's docket as explained *infra*.

1

**Procedural History**

The Plaintiff, David B. Cook, II (hereinafter referred to as "Claimant"), protectively filed his applications for Titles II and XVI benefits on May 29, 2013, alleging disability since January 21, 2009, because of "mental disorders, psychotic, anxiety, incontinent, eating, depression, and posttraumatic stress disorder."[1] (Tr. at 255.) Hiss claim were initially denied on August 29, 2013 (Tr. at 118-123.) and again upon reconsideration on April 11, 2014. (Tr. at 128-134, 135-141.) Thereafter, Claimant filed a written request for hearing on June 8, 2014. (Tr. at 142-143.) An administrative hearing was held on January 19, 2016 before the Honorable Valerie A. Bawolek, Administrative Law Judge ("ALJ"). (Tr. at 37-67.) On February 17, 2016, the ALJ entered an unfavorable decision. (Tr. at 20-36.) On April 20, 2016, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 16-17, 313-315.) The ALJ's decision became the final decision of the Commissioner on April 24, 2017 when the Appeals Council denied Claimant's Request. (Tr. at 1-7.)

On June 23, 2017, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 9 and 10.) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (Document No. 12.), in response, the Commissioner filed a Brief in Support of Defendant's Decision. (Document No. 13.) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 47 years old as of the alleged onset date, a "younger person", and then

---

[1] Claimant indicated in his Disability Report, submitted on July 12, 2013 that he stopped working for "other reasons", and that he was "laid off" on January 28, 2009. (Tr. at 255.)

changed age categories as a person "closely approaching advanced age" at the time of the ALJ's decision. See 20 C.F.R. §§ 404.1563(c)-(d), 416.936(c)-(d). (Tr. at 68.) Claimant has a high school diploma, and completed two years of college. (Tr. at 256.) Claimant had been treating and in psychotherapy for his mental impairments and testified that they became worse after he lost his job in 2009. (Tr. at 48.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner,

McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2014. (Tr. at 25, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date of January 22, 2009. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following medically determinable impairments: carpal tunnel syndrome; hypertension; hyperthyroidism; dysthymia; specific phobia; major depression; anxiety; mood disorder; agoraphobia; and personality disorder. (Id., Finding No. 3.) In addition, the ALJ concluded Claimant had no impairment or combination of impairments that significantly limited (or expected to significantly limit) his ability to perform basic work-related activities for twelve consecutive months, and therefore, had no "severe" impairment or combination thereof. (Tr. at 26, Finding No. 4.) Finally, the ALJ determined Claimant had not been under a disability from January 22, 2009 through the date of the decision. (Tr. at 31, Finding No. 5.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the ALJ erred at step two in her analysis by finding he had no severe impairment, specifically with regard to the medical evidence in Exhibits 10F and 13F that document severe right carpal tunnel syndrome and moderately severe left carpal tunnel syndrome. (Document No. 12 at 5.) Additionally, the ALJ failed to discuss Exhibit 21F, which was submitted after the hearing but before the decision was entered, which documented Claimant's severe mental impairments. (Id. at 5-6.) Nowhere does the ALJ consider or weigh the opinions of Claimant's treating psychiatrist or treating therapist who indicated Claimant would have difficulties functioning in the workplace. (Id. at 6.)

Claimant asserts that the decision is not supported by substantial evidence and asks this Court to award him benefits, or alternatively, to remand for rehearing and grant his costs expended herein. (Id.)

In response, the Commissioner contends that Claimant failed to carry his burden that he had severe impairments, and that the ALJ's determination that his carpal tunnel syndrome was not severe is supported by substantial evidence. (Document No. 13 at 13.) Further, the ALJ thoroughly considered the evidence regarding this physical impairment, which did not indicate Claimant suffered from any significant limitations from it, and the testifying medical expert, Dr. Judith Brendemeuhl, did not identify any significant limitations in Claimant's ability to perform work-related activities as a result of carpal tunnel syndrome. (Id. at 13-14.) The ALJ reviewed Claimant's daily activities which further belied the severity of his condition. (Id. at 14-15.)

With respect to Claimant's mental impairments, the Commissioner points out that the ALJ performed the special technique in evaluating same, and because he had at most mild or no

limitations in the Regulations' four areas of functioning, she properly found his mental impairments were not severe. (Id. at 15-17.) These findings were corroborated by the testimony of the psychological expert, Dr. Mary Buban. (Id. at 16-17.) The Commissioner further argues that the ALJ considered Claimant's treatment history as well as the opinion evidence that supported her findings and conclusion. (Id. at 17-19.)

With regard to Claimant's argument that the ALJ did not consider the opinion provided by his psychiatrist, Dr. Noel Jewel, the Commissioner argues that Dr. Jewel did not treat Claimant, as he testified that he never met the doctor. (Id. at 19.) Moreover, the opinion actually came from Claimant's therapist, Patti McMahan, as expressly stated by Dr. Jewel in his letter, and the 2016 Regulations did not acknowledge Ms. McMahan as an acceptable medical source. (Id. at 19-20.) The Commissioner further argues that this opinion was obtained by Claimant after his disability hearing when he visited his provider, noting that he was "furious" and asked who "screwed him over" on his disability paperwork. (Id. at 19.) In addition, Claimant has failed to show how the ALJ's omission of this opinion evidence caused him prejudice because the evidence would not have changed the outcome of this case, as it was contradictory to the medical and other evidence. (Id. at 19-20.) Though the ALJ did not explicitly reference this opinion, the Commissioner asserts that she clearly considered it because she referenced it in her review of the State agency opinions. (Id. at 20.)

The Commissioner states the final decision is supported by substantial evidence and asks the Court to affirm it. (Id.)

## The Relevant Evidence of Record[3]

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Medical Evidence Related to Carpal Tunnel Syndrome:

Claimant treated at North Roanoke Family Practice on three occasions between October 2009 and June 2012. (Tr. at 329-331, 338-339, 344-345.) Treatment notes dated October 2, 2009 and January 17, 2011 indicate that Claimant reported "doing good;" he felt his mood disorder was under good control; had normal mood, memory, and affect; and reported no problems with medication. (Tr. at 329-330, 338-339.) Musculoskeletal examinations showed a normal range of motion, no edema, normal reflexes, and normal muscle tone. (Tr. at 331, 345.)

Claimant sought treatment with Jeff Rodebaugh, M.D., from March 2014 to May 2015. (Tr. at 427, 429-431, 464-467, 493-494.) He complained of bilateral wrist pain with associated numbness and tingling in May 2014 after pruning trees in the yard. (Tr. at 430.) A September 2014 EMG nerve conduction study showed severe right carpal tunnel syndrome and moderately severe left carpal tunnel syndrome, and he had a positive Tinel's sign[4] on several occasions. (Tr. at 417-419, 427, 429, 464, 466, 494.) Examinations with Dr. Rodebaugh from May 2014 through May 2015 showed full range of motion bilaterally and no deformities. (Tr. at 427, 429, 464, 466, 494.) Dr. Rodebaugh prescribed Sulindac and wrist splints at night. (Tr. at 427.) With this treatment, Claimant's symptoms improved. (Tr. at 464, 466, 493.) Dr. Rodebaugh discussed injections, but Claimant declined. (Tr. at 465, 467, 494.) At these examinations, Claimant also reported "doing well" on his medication for anxiety and depression. (Tr. at 427, 429, 464, 493.)

_____

[4] The Commissioner explains that a Tinel's sign "is a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. Dorland's Illustrated Medical Dictionary, 1644 (29th ed. 2000)." (Document No. 13 at 3, fn.3.)

At Claimant's next physical examination at Richwood Family Practice in late 2015, he did not seek treatment for or mention carpal tunnel syndrome. (Tr. at 490-492.)

<u>Opinion Evidence Related to Carpal Tunnel Syndrome:</u>

On August 29, 2013, State agency reviewing internist, Dr. James Wickham, noted that despite his complaints of hand pain, Claimant could perform activities of daily living such as shopping, reading, and completing his own forms. (Tr. at 72, 83.) Claimant had normal examinations, full range of motion, and did not require further care. (<u>Id</u>.) Dr. Wickham opined that Claimant did not have a severe physical impairment. (<u>Id</u>.) On April 8, 2014, Caroline Williams, M.D., State agency physician, independently reviewed the updated record and affirmed Dr. Wickham's opinion. (Tr. at 99, 111.)

During the administrative hearing on January 19, 2016, medical expert Judith Brendemeuhl, M.D. testified about Claimant's physical impairments. (Tr. at 41-42.) She reviewed Claimant's nerve conduction study as well as his physical examination findings, which included a positive Tinel's sign, and noted that a Phalen's test[5] had not been administered. (Tr. at 42.) Dr. Brendemeuhl explained that Claimant's treatment was limited to wrist splints and a non-steroidal anti-inflammatory medication, and that Claimant declined injections and did not report symptoms at a later examination. (<u>Id</u>.) She also noted Claimant's improvement and stated that there was "nothing else there." (<u>Id</u>.)

<u>Medical Evidence Related to Mental Impairments:</u>

On January 5, 2012, Claimant saw Tracey Criss, M.D. for dysthymia after not being seen in "quite some time." (Tr. at 320.) Claimant had some negative talk, but was alert, coherent, polite,

---

[5] The Commissioner stated that the "Phalen's maneuver is used for the detection of carpal tunnel syndrome. <u>Dorland's Illustrated Medical Dictionary</u>, 1644, 1054 (29th ed. 2000)." (Document No. 13 at 4, fn.5.)

and cooperative; he answered questions; his speech was clear, fluent, and goal-directed; and he talked a lot about sports. (Id.) He was to continue medication and follow up in six months. (Id.)

Claimant also treated at Serenity Counseling Center; on January 18, 2012, he presented for an initial assessment and complained of an inability to eat out, a sense of worthlessness, angry outbursts with destruction of property, and being resentful and bitter after a three year job loss. (Tr. at 350.) Later progress notes from Serenity, including one from April 2012, revealed that Claimant's mood stabilized with medication, and he stated that he would call when services were required. (Tr. at 352.) He reported continued stability in May 2012, but with some bad days and depression; Claimant advised he "will call if needed." (Id.) He was placed on inactive status in July 2012 "[d]ue to reported stability and presenting issues." (Tr. at 354.) He did not contact Serenity again until June 2013, when he requested a psychological referral. (Tr. at 352.)

From October 29, 2013 to February 7, 2014, Claimant treated with social worker Patricia Marlowe and nurse practitioner Tamara Baldwin for counseling and medication management. (Tr. at 379-394.) Claimant reported to Ms. Marlowe that his major problem was marital discord and "describes himself as becoming angry and irritated more than sad"; he was articulate and energetic, and they discussed strategies for change. (Tr. at 379, 383.)

On November 22, 2013, Ms. Baldwin noted that Claimant had a severe depression score on his PHQ-9, a self-assessment for depression. (Tr. at 385.) On examination, he was consistently alert and oriented to person, place, time, date, and situation; had no thought disorder; was able to participate; made good eye contact; was able to concentrate and stay focused in the encounters; had intact memory, linear thought process, clear/fluent speech, appropriate affect, and no thought disorder; was open/readily conversant; had good insight; was well-groomed; and mood ranged

from depressed to euthymic. (Tr. at 385, 391, 394.) By February 2014, Claimant reported that his medication was working, although the generic did not work as well as name brand. (Tr. at 391.)

H.P. Kornhiser, D.O., examined Claimant on April 24, 2014 for a psychiatric evaluation. (Tr. at 397-404.) Claimant reported that he had been laid off when his job downsized in 2009, and had not worked since that time. (Tr. at 398, 402.) Examination revealed that Claimant was alert and oriented; had clear, articulate, understandable, and linear speech; no hallucinations, delusions, or loose associations; and no abnormal psychomotor behavior. (Id.) He had a fairly negative attitude, dysphoric mood, and constricted affect. (Id.) Dr. Kornhiser noted that Claimant gave a good history; had intact memory; recalled 3/3 objects; knew the past and current president; performed serials sevens; spelled "world" forward and backward; attended and concentrated appropriately; abstracted proverbs; and had intact judgment and some insight. (Id.) Dr. Kornhiser noted that Claimant did fairly well in the job market until he was fired and his symptoms became worse. (Tr. at 399, 403.) Dr. Kornhiser noted that medication had certainly helped, and recommended that Claimant see a therapist. (Id.)

Claimant began treating with Anna Stout-Tuckwiller, PA-C, at Seneca Health Services on May 19, 2014. (Tr. at 436-439.) He reported depression and anxiety, and could not think of a cause other than not working. (Tr. at 436.) Wellbutrin and Cymbalta were somewhat effective for him. (Tr. at 437.) On mental status examination, Claimant was alert; oriented to person, place, purposes, and time of visit; had fluent and non-pressured speech; intact memory; satisfactory attention and concentration; appropriate language and fund of information; linear and logical thought processes; appropriate associations; no hallucinations; depressed and anxious mood, somewhat dysthymic affect; intact judgment and insight; and no homicidal or suicidal ideations. (Tr. at 438.) PA-C

Stout-Tuckwiller discussed weaning Claimant off Cymbalta and restarting Prozac that had been quite effective for him; she recommended lorazepam, but Claimant was not interested at the time. (Id.) She also recommended counseling and gave Claimant a good prognosis. (Id.) He was instructed to follow up in two weeks. (Id.)

At his follow up visit, Claimant's mental status examination remained essentially the same; he was "doing okay" with a somewhat dysthymic affect. (Tr. at 411, 444.) Claimant did "fine" coming off Cymbalta, having started Prozac recently. (Tr. at 410, 443.) Mental status examination revealed full orientation; fluent and non-pressured speech; intact memory; satisfactory attention and concentration; a connected and logical thought process; and intact judgment and insight. (Tr. at 410-411, 443-444.) His Prozac was increased; it was noted that his "[r]esponse to treatment thus far has been good." (Tr. at 411, 444.)

On June 30, 2014, Claimant reported doing better on Prozac, but at times was close to breaking down, and had anxiety and panic when going out to eat. (Tr. at 440.) His mental status examination remained essentially benign, and his mood was "doing better" and his affect generally euthymic. (Tr. at 441.) By August 25, Claimant reported doing well recently and felt the medication change was effective. (Tr. at 446.) His mental status examination was unchanged; his mood was "better" and his affect generally euthymic. (Tr. at 447.) On November 17, 2014, Claimant reported to Ms. Stout-Tuckwiller that he was doing well on his medication. (Tr. at 449.) He had not taken lorazepam, but continued to have some anxiety about going out at times. (Id.) His mental status examination continued to reveal benign findings; his mood was good and he had a full affect. (Tr. at 450.)

At his next examination on February 9, 2015, Claimant reported several significant

stressors, but felt his medications continued to work very well. (Tr. at 453.) He tried lorazepam before a Christmas party and did well with no side effects, "but isn't sure if he felt more relaxed or not." (Id.) His mental status examination remained essentially the same; he had a euthymic mood and appropriate affect. (Tr. at 457.) On May 4, 2015, Claimant reported that his medications seemed to help, but he still having lack of motivation. (Tr. at 480.) His mental status examination was unchanged from February, and his medications continued without change. (Tr. at 480-481.) By August 3, 2015, Claimant reported doing well with more energy and motivation. (Tr. at 477.) His mental status examination remained unchanged. (Tr. at 477-478.)

Starting October 26, 2015, Claimant saw Margaret Bruns, RN-C at Seneca Health. (Tr. 474-476.) He reported doing well with more energy and motivation, with only occasional rough days where he can "sleep a day away" at times. (Tr. at 474.) He used lorazepam sparingly, only when going to a restaurant or social events. (Id.) His mental status examination revealed that he was alert; oriented to person, place, purpose, and time of visit; had normal speech; intact recent and remote memory; cooperative attitude; euthymic mood; appropriate affect; sufficient concentration/attention; no memory impairment; appropriate language; average fund of knowledge; logical/coherent thought process; appropriate thought content; and appropriate judgment/insight. (Tr. at 474-475.) The same day, Claimant saw therapist Patti McMahan for an individual therapy session. (Tr. at 532-534.) He reported doing "pretty good", but got "very mad" at his wife and nephew for failing to pay a bill. (Tr. at 533.) Examination showed full orientation, good attention/concentration, intact memory, normal mood, and bright affect. (Tr. at 534.)

Claimant saw Ms. McMahan three more times in November and December 2015. (Tr. at 535-542.) During those visits, Claimant was oriented to person, place, time, and situation; had

adequate to good attention/concentration; intact memory; logical clear thoughts; mood ranging from depressed/sad/edgy/tense to normal; and no homicidal or suicidal ideation. (Tr. at 539-540.) Claimant reported that he was in a "great" mood, that he was getting along with his wife, that he took his medication and was able to eat in public for Thanksgiving with "no problems," and decorated for Christmas. (Tr. at 539.)

On January 25, 2016, Claimant saw both Ms. McMahan and Ms. Bruns. (Tr. at 529-530, 543-545.) Ms. Bruns performed a mental status examination that indicated Claimant was alert; oriented to person, place, purposes, and time of visit; had normal speech; cooperative attitude; sufficient concentration/attention; no memory impairment; appropriate language; average fund of knowledge, logical/coherent thought process; appropriate thought content; appropriate judgment and insight; and was fairly talkative/pleasant, but had a depressed mood. (Tr. 529-530.) Claimant reported being under more stress after his disability hearing. (Tr. at 529.)

When Claimant saw Ms. McMahan, she noted that Claimant was "furious when he came into my office. He wanted to know immediately why I or whomever had screwed him over and filled out his disability forms the way we did. [Claimant] is furious as to why Dr. Jewell would say he is able to work when [Claimant] [has] never seen Dr. Jewell."[6] (Tr. at 544.) Ms. McMahan apologized and assured him they would help him "fix this and that I had not seen the papers sent in." (Id.) Ms. McMahan noted that Claimant was oriented to all spheres, had adequate attention/concentration, that his immediate, recent and remote memories were intact and his

---

[6] Ms. McMahan noted that Claimant kept referring to Dr. Jewell as a female and that he "was particularly angry with me because he could not understand why or how I would do this when I can tell what his mood is before he even walks back to my office." (Tr. at 544.) As pointed out by the Commissioner, the record also contains three treatment notes signed by Noel Jewell, M.D., which were duplicates of those signed by Ms. Stout-Tuckwiller, with the same mental status examinations and findings. (Tr. at 406-407, 440-448.) (Document No. 13 at 7, fn.6.)

though clear and logical, but his mood was nervous and a tense and edgy affect. (Tr. at 545.)

Psychological Opinion Evidence:

On August 5, 2013, Claimant underwent a mental consultative examination with licensed clinical psychologist Mary Ann Koch, Ph.D. (Tr. at 358-370.) Although Claimant reported "phobic fears" and panic attacks, he seemed to manage well with medication and alcohol until he lost his job. (Tr. at 358.) He had no pain complaints. (Id.) Claimant believed he was laid off because he had the highest salary level. (Id.)

On examination, Claimant calmed down as the session progressed; he had a clean and appropriate appearance; neutral (not depressed) mood, but anger and irritation at others; was vague about dates, but was able to recall jobs, friends, and his childhood; denied delusions or hallucinations; had normal thought content and organization; no confusion; normal attention span, concentration, persistence and task completion; and normal fund of information. (Tr. at 360-361.) He kept his office manager job for decades, and was unable to find work at his previous salary level, which made him discouraged and angry. (Tr. at 362.) Although he had an eating phobia and anxiety, his conditions did not prevent him from being successfully employed, and he did not seem worse since 2009. (Id.) Dr. Koch noted that Claimant's problem was not managing funds, but lack of funds. (Id.)

On August 29, 2013, State agency psychologist Eric Oritt, Ph.D., reviewed the record and opined that Claimant had mild restriction of activities of daily living, moderate difficulties in social functioning and in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration. (Tr. at 73, 84.) He opined that Claimant could perform simple, routine tasks with limited contact with the public. (Tr. at 73, 76, 84, 87.) On April 4, 2014,

State agency psychologist Jeff Harlow, Ph.D., affirmed Dr. Oritt's opinion. (Tr. at 97, 101, 109, 113.)

On March 17, 2015, Dr. Noel Jewell completed a Medical Assessment of Ability to Do Work- Related Activities (Mental). (Tr. at 502-504.) Dr. Jewell opined that Claimant had "good" ability (defined as more than satisfactory) to perform various tasks, such as following work rules, relating to or dealing with others, maintaining attention/concentration, understanding, remembering, and carrying out simple, detailed, and complex instructions, relating in an emotionally stable manner, and demonstrating reliability. (Tr. at 502-503.)

At the January 19, 2016 hearing, medical expert Mary Eileen Buban, Psy.D., testified with respect to Claimant's mental health impairments. (Tr. at 43-47.) Dr. Buban noted that Claimant underwent limited treatment early in the relevant period, and had stopped going to counseling because his medication was working well. (Tr. at 44.) When Claimant did follow up for treatment, he had a neutral mood, normal attention, concentration, persistence, and pace, and intact memory. (Id.) She noted that Claimant experienced financial difficulties and was upset because he was unable to find work at his previous salary level. (Id.) Although Claimant's depression vacillated, he did better on medication (which was effective), with mental status exams showing intact memory, reasoning, concentration, and attention; euthymic mood, and successful serials sevens. (Tr. at 45.) Dr. Buban opined that Claimant's mental impairments were non-severe, as he had no limitation in activities of daily living, mild limitation in social functioning, no limitation in concentration, persistence, or pace, and no episodes of decompensation. (Tr. at 46-47.)

Following Claimant's confrontation with Ms. McMahan at Seneca Health Services in January 2016, Dr. Jewell submitted a letter dated February 2, 2016, along with a checkbox form

that he completed along with Ms. McMahan. (Tr. at 525-528.) In the letter, Dr. Jewell stated that he was submitting a newly completed form with the input of therapist Patti McMahan, as the prior opinion did not have her input. (Tr. at 525.) He noted that it was "the opinion of Ms. McMahan that Mr. Cook is not able to work." (Id.) The attached checkbox form, which was the same as the 2015 form, indicated that Claimant's work-related abilities ranged from fair to poor. (Tr. at 526-527.)

**Claimant's Application Forms:**

In his Function Report dated July 23, 2013, Claimant asserted that he can independently perform personal care (including shaving himself), drive a car, and go out alone. (Tr. at 265-267.) He did limited household chores and mowing on a weekly basis, though it took him days to finish. (Tr. at 266.) He also cared for pets, shopped in stores once per week, handled his own finances, read, and watched television daily. (Tr. at 265-268.) He used to go to social activities, but does not anymore; he cannot get along with people, including authority figures and cannot handle stress or changes in routine and has a fear of eating in public. (Tr. at 269-270.)

**The Administrative Hearing**

<u>Claimant Testimony:</u>

Claimant explained that he is afraid to eat in front of people and that it interfered with his work. (Tr. at 49-50.) Because he would not eat at work sometimes, he did not have the ability to do his job correctly. (Tr. at 50.) He could only eat certain foods and would drive home to eat because he was not comfortable with other people around him; he has choked when somebody had to perform the Heimlich Maneuver on him. (Tr. at 51.) Claimant testified that he was not

comfortable eating around his wife and during the holidays, he would take his food and eat on the porch by himself because he had anxiety. (Tr. at 52.)

Because he had fears of doing activities with others, such as going to ball games and concerts and other things he enjoys, Claimant felt depressed and thought of suicide, but never acted on it. (Tr. at 53.) The smallest things can trigger his depression and he would just go to bed; this happens at least on a weekly basis. (Tr. at 54.) His days consist of sleeping a lot, and estimated he slept 12 to 14 hours per day. (Tr. at 55.) His bed or couch is his safe haven. (Id.)

Claimant also reported having frequent crying spells, but medication has made them less frequent, about once or twice per week. (Tr. at 55-56.) Claimant admitted to having tantrums, but medication has "taken it down some", though he would physically tear or break things, never a person, but he would verbally abuse anyone who was listening. (Tr. at 56.) These outbursts have caused him problems with his employers. (Tr. at 56-57.)

Regarding his carpal tunnel syndrome, Claimant testified that his hands were fine as long as he did not do a whole lot with them, though he can mow the lawn with a push mower for 30 to 40 minutes, operate a blower or weed eater. (Tr. at 57.) He stated that he could not do warehouse work anymore because he could not pick up 50-60 pounds several times a day and he drops things. (Tr. at 58.) Claimant estimated that he has had trouble with his hands since the mid 1990's, but they have been severe in the last 10 years. (Tr. at 59.)

Ruth Bass Cook Testimony:

Mrs. Cook is Claimant's wife and described him as always mad and irritable; she testified that on a daily basis Claimant "just flips out and he starts breaking stuff and screaming." (Tr. at 60.) Mrs. Cook indicated that there was "a gap between" what is documented in Claimant's

medical records and how Claimant really is – he is a sick person and does not know how to tell his therapists. (Tr. at 61.) Mrs. Cook confirmed that Claimant has an eating disorder where he chokes easily and that he has gotten worse over the years and may need therapy "to learn how to eat again." (Tr. at 62.) She believes Claimant has PTSD and he feels unworthy and has no life. (Tr. at 63-64.) Mrs. Cook stated that Claimant spends the whole morning in the bathroom and that he sleeps at least 16 hours out of the day; she said that Claimant says that is the only place he feels safe. (Tr. at 64-65.)

## Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**<u>Analysis</u>**

As previously stated, Claimant argues the ALJ erred in finding his carpal tunnel syndrome and mental impairments non-severe impairments. (Document No. 12 at 5-6.)

<u>Determining Severe Impairment:</u>

A "severe" impairment is one "which significantly limits your physical or mental ability to do basic work activities." <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c); <u>see also</u> <u>Id</u>. §§ 404.1521(a), 416.921(a). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." <u>Id</u>. §§ 404.1521(b), 416.921(b). The Regulations provide examples of these activities: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, coworkers and usual work situations; and (6) dealing with changes in a routine work setting. <u>Id</u>. Contrariwise, an impairment may be considered " 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." <u>Evans v. Heckler</u>, 734 F.2d 1012, 1014 (4th Cir. 1984).

Additionally, Claimant had to prove that he had an impairment (or combination of impairments) that had more than a minimal effect on his ability to do basic work activities for a continuous period of no less than 12 months. 20 C.F.R. §§ 404.1505(a), 416.905(a). Claimant also bears the burden of establishing a disabling impairment. <u>See</u> <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5 (1987) (holding that the claimant bears the burden of proof and persuasion at steps one through four, stating "it is not unreasonable to require

the claimant, who is in a better position to provide information about his own medical condition, to do so").

With regard to Claimant's medically determinable impairments, including carpal tunnel syndrome and his mental impairments, the ALJ found they were non-severe pursuant to 20 C.F.R. §§ 404.1521, 416.921. (Tr. at 26.) The ALJ reached this conclusion based on Claimant's alleged symptoms and to the extent they were consistent with the medical and other evidence, as well as on the opinion evidence. (Id.)

Regarding carpal tunnel syndrome, the ALJ noted Claimant's testimony that "his hands are fine unless he does much with them. He can mow his lawn for no more than 30 to 40 minutes due to numbness of the hands. He has had problems with his hands since the 90s, but they have been severe for approximately 10 years." (Tr. at 27.) Next, the ALJ considered the testimony provided by Dr. Brendemuehl, discussed *supra*, and acknowledged that she "stated that the most recent records from August 2015 do not mention carpal tunnel syndrome." (Tr. at 27-28.) Specifically, the ALJ noted that Dr. Brendemuehl "did not identify any limitation resulting from this impairment." (Tr. at 28.) The ALJ gave her opinion "great weight" as she had the opportunity to review the entire record and cited specific exhibits to support her analysis. (Id.) Additionally, the ALJ reconciled Dr. Brendemuehl's opinion with Claimant's report that he mowed his lawn, shaved himself, drove a care without much difficulty, and otherwise engaged in activities "not compatible with total physical disability or inability to use one's hands." (Id.) In sum, the ALJ found that "based on Dr. Brendemuehl's testimony, the claimant's own statements, and treatment records showing improvement with conservative treatment" his carpal tunnel syndrome is non-severe. (Id.)

The undersigned agrees with the Commissioner that despite Claimant's diagnosis of carpal

tunnel syndrome, and that EMG studies indicated it was moderate to severe, the evidence did not demonstrate a functional limitation that would have precluded substantial gainful activity. See Gross v. Heckler, 785 F.2d 1163, 1165 (4th Cir. 1986). (Document No. 13 at 12, 15.) Accordingly, the undersigned **FINDS** the ALJ's conclusion that Claimant's carpal tunnel syndrome was non-severe supported by substantial evidence.

Regarding Claimant's mental impairments, in addition to considering the testimonies provided by Claimant as well as Mrs. Cook, *supra*, the ALJ considered the medical evidence of record, including Claimant's treatment records and the opinion evidence provided by mental health experts. (Tr. at 27, 28-30.) The ALJ considered the testimony given by Dr. Buban, who provided a history of Claimant's mental impairments, detailed *supra*, noting that she found they "caused no more than mild limitations and were non-severe." (Tr. at 28.) After her recitation of Dr. Buban's testimony regarding Claimant's mental health treatment and generally normal mental status examinations with no noted side effects to his medications, the ALJ compared this evidence with Claimant's own reports of having "no significant problems shopping in stores, driving a car, watching television, reading, or performing personal care." (Tr. at 28-29.) The ALJ acknowledged that Dr. Buban concluded the record did not establish that Claimant had a severe mental impairment, though he "has a specific phobia (eating in public)." (Tr. at 29.) Therefore, the ALJ found that based on the overall record, Claimant's mental impairments were non-severe, and specifically found no evidence that his problems eating in public resulted in any work-related functional limitations. (Id.)

After further reviewing the opinion evidence provided by Dr. Koch, Dr. Oritt, and Dr. Harlow, the ALJ performed the "special technique" pursuant to Sections 404.1520a and 416.920a: Claimant had no limitations in activities of daily living; mild limitations in social functioning; no

limitations in his concentration, persistence, or pace; and no evidence any episodes of decompensation, which have been of extended duration. (Tr. at 30-31.) Additionally, at step three, the ALJ considered Claimant's mental impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1 and determined that they did not meet or equal the severity "under both listings 12.04 and 12.06 and agrees with Dr. Buban that these do not apply." (Tr. at 31.)

In sum, the undersigned further agrees with the Commissioner that the evidence concerning Claimant's mental impairments were not severe pursuant to the Regulations, and that at this step in the sequential evaluation process, Claimant did not carry his burden in proving that they significantly limited his ability to do basic work activities. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. §§ 404.1512(c), 416.912(c). Accordingly, the undersigned **FINDS** the ALJ's determination that Claimant's mental impairments were non-severe is supported by substantial evidence.

The Evaluation of Opinion Evidence:

Claimant takes issue with the fact that the ALJ did not weigh the opinion provided by his therapist, Ms. McMahan, identified as Exhibit 21F (Tr. at 524-528.), which indicated his mental impairments were severe, precluding employment. (Document No. 12 at 5-6.) There is no factual dispute that Claimant had never been treated by Dr. Jewell. Though Dr. Jewell himself submitted Ms. McMahan's February 2016 opinion, and even specified in his letter that "the opinion of Ms. McMahan that [Claimant] is not able to work due to his anxiety, depression, and anger", the undersigned agrees with the Commissioner that pursuant to the Regulations[7], Dr. Jewell is not a

---

[7] 20 C.F.R. §§ 404.1502, 416.902 provide that

"*Treating source* means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing

treating source whose opinion would be entitled to controlling weight. (Tr. at 525.) (Document No. 13 at 19.)

Of further interest here is that the opinion contained in Exhibit 21F is that of Claimant's therapist, who is not considered an acceptable medical source under the Regulations at the time of the ALJ's decision. <u>See</u> 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1) ("In addition to evidence from the acceptable medical sources . . . we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to . . . therapists.") Though the ALJ did not summarize this opinion in her discussion, she considered it, as she specifically noted that "Exhibits 7F though 21F were received after Dr. Harlow's reconsideration review." (Tr. at 30.) Exhibit 21F was also listed in the "List of Exhibits" attached to the ALJ's decision. (Tr. at 36.)

The Regulations provide that "a case record should reflect consideration of opinions by other sources who have seen a claimant in their professional capacity." SSR 06-03p, 2006 WL 2329939, at *6. Of further interest here is that the Agency's Ruling further provides "[n]ot every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case." <u>Id</u>., at *5. This jurisdiction has previously found that there "is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision;" "[t]o require an ALJ to refer to every physical observation recorded regarding a . . . claimant in evaluating that claimant's . . .

---

treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). . . We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source. (*italics* in original)

alleged condition[s] would create an impracticable standard for agency review, and one out of keeping with the law of this circuit." See, Pack v. Colvin, 2014 WL 6607019, at *20 (S.D.W. Va. Nov. 19, 2014). In short, the ALJ failure to discuss Ms. McMahan's opinion was not in error, particularly because the evidence supporting the ALJ's disability determination stemmed from her thorough examination of the medical evidence, and was from acceptable medical sources. Moreover, to the extent that Ms. McMahan opined that Claimant was disabled, such a determination is reserved to the Commissioner, and the ALJ had no duty to give it any special significance. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). Accordingly, the undersigned **FINDS** the ALJ's failure to discuss Ms. McMahan's opinion was not erroneous.

It is also important to note that Ms. McMahan's treatment notes contained in Exhibit 22F were not part of the record reviewed by the ALJ or Dr. Buban. (Tr. at 529-545.) However, this evidence was part of the Exhibits List considered by the Appeals Council along with the underlying record in its review. (Tr. at 5.) Though the ALJ did not have an opportunity to review Exhibit 22F, the undersigned notes that Ms. McMahan's treatment records contradict her opinion provided in Exhibit 21F.[8] Further, the evidence of record that the ALJ had an opportunity to review, including Dr. Buban, support their determinations that Claimant's mental impairments were non-severe. Finally, even though Claimant is correct that the ALJ did not discuss Ms. McMahan's opinion, he

---

[8] Pursuant to 28 U.S.C. § 405(g), remand is warranted "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" Evidence is "new" if it is not duplicative or cumulative. Wilkins v. Secretary, Dep't of Health & Human Serv., 953 F.2d 93, 96 (4th Cir. 1991) (*en banc*). "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." Id. There is no evidence as to why Exhibit 22F was not before the ALJ, when those records predate the opinion provided by Ms. McMahan in Exhibit 21F, however, the medical evidence in Exhibit 22F does not demonstrate "a reasonably possibility" that it would have changed the ALJ's decision. Id. Indeed, the fact that Claimant presented to his therapist angrily and that Ms. McMahan promised to correct the previously submitted medical source statement provides further support of the ALJ's discretion to consider the "other source" opinion in her analysis per Sections 404.1513(d) and 416.913(d). Moreover, the undersigned finds the stark contrast between Ms. McMahan's opinion from her recent treatment notes belies the credibility of her opinion.

has not demonstrated how this omission caused him prejudice, given the gravamen of the evidence supports the ALJ's findings and conclusion. <u>Shineski v. Sanders</u>, 556 U.S. 396 (2009).

Accordingly, the undersigned **FINDS** the ALJ's decision finding Claimant was not disabled is supported by substantial evidence and complies with legal standards. <u>Hays v. Sullivan</u>, 907 F.2d at 1456.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for judgment on the pleadings (Document No. 12.), **GRANT** the Defendant's request to affirm the ALJ's decision (Document No. 13.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.

Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: November 22, 2017.

Omar J. Aboulhosn
United States Magistrate Judge